UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JAMES DAVID WILLIAMS,

        Plaintiff,

    v.

CHARLES RICHEY, et al.,

        Defendants.

Case No. 4:19-cv-05685 YGR (PR)

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

## I.      INTRODUCTION

Plaintiff James David Williams, a state prisoner currently incarcerated at the Correctional Training Facility ("CTF"), filed this *pro se* civil rights complaint under 42 U.S.C. § 1983.  Dkt. 1. On April 28, 2020, the Court determined that Plaintiff stated cognizable claims under the First Amendment's Free Exercise Clause, the Fourteenth Amendment, and the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc-1, against California Department of Corrections and Rehabilitation ("CDCR") Religious Programs Oversight Unit Manager Charles Richey, CTF Warden C. Koenig, and CTF Protestant Chaplain B. D. Min ("Defendants").[1]  Dkt. 7 at 4.[2]  Specifically, Plaintiff alleges that Defendants limited his ability to purchase religious oils or musks for his "daily meditation/prayers" in violation of his rights under the constitution and RLUIPA.  Dkt. 1 at 3, 5-9.  Plaintiff seeks monetary damages and injunctive relief.  *Id.* at 3.

The parties are presently before the Court on Defendants' motion for summary judgment. Dkt. 24.  Plaintiff filed an opposition, and Defendants filed a reply.  Dkts. 28, 32.  Having read

---

[1] The following Defendants were dismissed from this action for failure to state a cognizable claim pursuant to the Court's April 28, 2020 Order of Partial Dismissal and Service: Ralph Diaz (CDCR Secretary); D. Chamberlain (Assistant Warden); Y. Friedman (Jewish Chaplain); and K. Hoffman (Chief Deputy Warden).  Dkt. 7 at 4.  The Court further found not cognizable Plaintiff's claim that Defendants violated his rights under the Religious Freedom Restoration Act ("RFRA") when they limited his access to religious oils or musks because the Supreme Court has declared the RFRA unconstitutional with respect to city and state governments.  *Id.* (citing *City of Boerne v. Flores*, 521 U.S. 507, 536 (1997)).

[2] Page number citations refer to those assigned by the Court's electronic case management filing system and not those assigned by the parties.

and considered the papers submitted and being fully informed, the Court hereby GRANTS

Defendants' motion for summary judgment.

## II.    BACKGROUND[3]

### A.    The Parties

At all times relevant to this action, Plaintiff was a California prison inmate at CTF,

Defendant Richey was the Community Resources Manager ("CRM") for the CDCR's Religious

Programs Oversight Unit, Defendant Koenig was the CTF Warden, and Defendant Min was the

CTF Protestant Chaplain.  *See* Oct. 26, 2020 Deposition of James David Williams attached as

Exhibit A to Declaration of Jean M. Trenbeath (Williams Depo.) at 6:22, 16:23; Declaration of C.

Richey (Richey Decl.) ¶ 4, Ex. A; Dkt. 1 at 2; Declaration of B. D. Min (Min Decl.) ¶ 1, Ex. B.

### B.    Factual Background

#### 1.    Relevant Background and Procedure for Requesting to Purchase Religious Artifacts (Including Religious Oils or Musks)

The following relevant background on the procedure for requesting to purchase religious

artifacts (including religious oils or musks) is undisputed unless noted otherwise.

CTF is a Level I and II General Population prison comprised of three separate facilities:

Facility C (Central); Facilities A and B (North); and Facility D (South).  Declaration of G. Romero

(Romero Decl.) ¶ 3.  While each facility has its own dining hall, clothing distribution, canteen,

medical/dental/mental health services, education, library, chapel, and visiting areas, there is only

one Receiving and Release ("R&R") Office that serves all three facilities.  *Id.*

The R&R Office is located in Facility C of CTF and is responsible for the intake of new

inmates at CTF, discharge of inmates upon parole, inmate housing assignments, the processing of

---

[3] This Order contains a few acronyms and abbreviations.  Here, in one place, they are:

| | |
|---|---|
| CDCR | California Department of Corrections and Rehabilitation |
| CTF | Correctional Training Facility |
| CRM | Community Resource Manager |
| DOM | Department Operations Manual |
| R&R | Receiving and Release |
| RPPM | Religious Personal Property Matrix |
| RLUIPA | Religious Land Use and Institutionalized Persons Act |
| RFRA | Religious Freedom Restoration Act |

United States District Court
Northern District of California

United States District Court
Northern District of California

1   an inmate's personal property upon intake to and departure from CTF, and is responsible for the

2   review and processing of inmate special purchase orders, including non-food religious items.

3   Romero Decl. ¶ 4.

4       The CTF R&R Office has a "special purchase officer," who is responsible for reviewing

5   special purchase order forms completed by inmates to ensure the allowable quantity of items are

6   ordered.  Romero Decl. ¶ 6; Declaration of D. W. McGriff, Sr. (McGriff Decl.) ¶ 3.  If the special

7   purchase involves the purchase of a religious artifact such as religious oils or musks, the special

8   purchase officer will also ensure that the items being ordered by the inmate: adhere to the

9   Religious Personal Property Matrix ("RPPM")[4]; are purchased from an approved vendor; and

10  meet institutional security requirements.  *Id.*; *see also* McGriff Decl. ¶ 14, Ex. D (true and correct

11  copy of RPPM, rev. June 23, 2013).

12      From October of 2014 to February of 2020, Correctional Officer D. W. McGriff, III, a

13  non-party, worked as the special purchase officer in the CTF R&R Office.  McGriff Decl. ¶ 1.

14  Correctional Sergeant G. Romero, also a non-party, supervised Officer McGriff from May 2018 to

15  February 2020.  Romero Decl. ¶ 7.  As part of his duties, Officer McGriff kept a binder of all

16  special purchase order forms the office received from inmates for review and approval.  Romero

17  Decl. ¶ 7; McGriff Decl. ¶ 4.  Officer McGriff made copies of each order form received, whether

18  or not the form was approved or disapproved.  *Id.*

19      CTF has a total of four chapels: two located in Facility C (Central), which are known as

20  Chapel I (for Protestant, Islamic, and Buddhist religions) and Chapel II (for Catholic, Jewish,

21  Quaker, and other religions); one located in Facilities A and B (North); and another located in

22  Facility D (South).  Min Decl. ¶ 5.  As mentioned above, Defendant Min served as the CTF

23  Protestant Chaplain, and he has held that position since 2014.  Min Decl. ¶ 1.

24      On November 19, 2018, the CTF supplement to Department Operations Manual ("DOM")

25  Section 101060, "Religious Programs," was amended to include an addendum to Section

26  101060.10, "Sacramental Wine and Religious Artifacts" ("CTF DOM Supplement Addendum,

27

28      [4] The RPPM applies to both male and female inmates, and it reflects personal religious
property that inmates may possess.  McGriff Decl., Ex. D.

1   101060").[5]  Romero Decl. ¶ 8, Ex. A; McGriff Decl. ¶ 5, Ex. A; Min Decl. ¶ 4, Ex. B.  The CTF

2   DOM Supplement Addendum, 101060 includes reference to a revised order form that inmates are

3   to use when attempting to purchase religious artifacts such as religious oils or musks.  Romero

4   Decl. ¶ 8; McGriff Decl. ¶ 5.  The special purchase order form for religious items contains three

5   signature blocks for the following officials: (1) the chaplain or community partnership manager;

6   (2) the R&R Office special purchase officer; and (3) the operations captain.  Romero Decl. ¶ 8,

7   Ex. B; McGriff Decl. ¶ 5, Ex. B; Min Decl. ¶ 4, Ex. A.

8        Defendants allege that the special purchase order forms are available in each chapel at

9   CTF, and that the list of CDCR-approved religious vendors for the current calendar year are also

10  available in each chapel.[6]  Min Decl. ¶ 5; Romero Decl. ¶ 10; McGriff Decl. ¶ 7.

11       Defendants allege that from December 10, 2018 to March 14, 2019, all chaplains at CTF,

12  including Defendant Min, were tasked with reviewing and then approving or denying these order

13  forms completed by inmates requesting to purchase certain non-food religious items.  Min Decl.

14  ¶ 4; Romero Decl. ¶ 9; McGriff Decl. ¶ 6.

15       A chapel clerk (an inmate at CTF) would review an order form to ensure that the religious

16  item or items sought for purchase is in accordance with the RPPM and that the addressed vendor is

17  on the approved vendor list.  Min Decl. ¶ 6.  After the form is reviewed for compliance, the chapel

18  clerk would then provide Defendant Min the order form to sign and date.  *Id.*  From there, the

19  chaplain-approved order form was sent to the R&R Office through institutional mail or was

20  delivered by hand.  Romero Decl. ¶ 11; McGriff Decl. ¶ 8.  During the time chaplains were

21  required to approve or deny these order forms—between December 10, 2018 and March 14,

22  2019—Defendant Min kept a book where he would record each time he approved an order form

23

24  _____

25       [5] Defendant Richey claims that he has no knowledge of the CTF DOM Supplement
        Addendum, 101060, as he took no part in drafting or reviewing it.  Richey Decl. ¶ 9.

26
27       [6] Plaintiff alleges that as of the date he signed his opposition on March 25, 2021, the chapel
        at CTF has been converted into COVID-19 isolation housing, and thus special purchase order
        forms are now unavailable and no other distribution area has been given to access these forms.
28      Dkt. 28 at 8.  However, Plaintiff does not contest the fact that these forms were available in 2019.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    submitted by an inmate.  Min Decl. ¶ 6.  This book included the inmate's name, assigned CDCR

2    number, assigned housing unit, chaplain name, and the date the order form was approved.  *Id.*

3         Once the R&R Office received the order form, Officer McGriff would check the inmate's

4    property files to ensure the allowable quantity of items were ordered.  Romero Decl. ¶ 11; McGriff

5    Decl. ¶ 8.  Officer McGriff also ensured that the religious items sought for purchase were on the

6    RPPM and that the addressed vendor was an approved vendor for that calendar year.  *Id.*  If the

7    information was complete and in compliance with department rules and regulations, Officer

8    McGriff would then send the form to the Custody Operations Captain for final review and

9    approval.  *Id.*  Once approved, the Custody Operations Captain would then forward the form to the

10   trust account office for processing or return to the inmate, who would then mail the form to a

11   family member for processing.  *Id.*  If an inmate wanted a family member to process the order

12   form, the R&R Office would route the completed and approved order form back to the chapel for

13   the inmate to pick up.  *Id.*

14        Defendants allege that if an order form did not contain a permissible quantity, was

15   addressed to a nonapproved vendor, and/or listed an item or items not adhering to the RPPM, the

16   order form would be returned to the inmate to give him the option of making necessary

17   corrections.  Romero Decl. ¶ 12; McGriff Decl. ¶ 9.  Defendants add that in some instances,

18   Officer McGriff would arrange to speak with the inmate to explain the discrepancy and let the

19   inmate know what needed to be corrected.  McGriff Decl. ¶ 9.

20        On March 14, 2019, CDCR headquarters distributed a memorandum to all CDCR

21   institutions, clarifying that institution chaplains are not required to provide written approval for

22   inmates to purchase non-food personal religious items, and that written approval for these items is

23   provided through the RPPM.  Min Decl. ¶ 11, Ex. G.  The March 14, 2019 memorandum removed

24   the need for inmates to first obtain signature approval from a chaplain, and thus only a two-

25   signature process was necessary for ordering religious items using the order form.  *Id.*

26        Defendants allege that since the March 14, 2019 memorandum, all chaplains at CTF,

27

28

United States District Court
Northern District of California

including Defendant Min, no longer review order forms for approval or disapproval.[7]  Min Decl. ¶ 12.  Defendants also allege that the special purchase order forms have not been revised to reflect this change, and that if an inmate comes to the chapel to submit an order form, the chapel clerk will forward the form to the R&R Office for review.  Romero Decl. ¶ 9; McGriff Decl. ¶ 6; Min Decl. ¶ 12.  According to Defendants, if the special purchase officer receives an order form with the chaplain signature block left blank, or with the notation "N/A" or "not applicable," the special purchase officer still processes the order form and ensures that the requested religious items are in compliance with the RPPM, requested in the allowable quantity, and from an approved vendor. Romero Decl. ¶ 13; McGriff Decl. ¶ 10.

It is undisputed that at all relevant times, Officer McGriff strictly adhered to the RPPM when he reviewed the order forms for the types of religious items inmates sought for purchase. McGriff Decl. ¶ 14, Ex. D.

### 2.    Plaintiff's Version

The following background relating to Plaintiff's claims is taken from the Court's April 28, 2020 Order of Partial Dismissal and Service:

> Plaintiff specifically alleges that CTF prison officials impermissibly burdened the practice of his religion by limiting his ability to order/purchase religious oil fragrances.  *See* Dkt. 1 at 3, 5-8.  Plaintiff does not specify his particular religion, but he states that Defendants [have] "been ordering [the religious oils] for 8 years at CTF . . . ." *Id.* at 14.  He claims he uses these religious oils for his "daily meditation/prayers." *Id.* at 6.  He alleges that on January 3, 2019, Defendant Richey "sent a[n] e-mail via [Defendant] Min . . . addressed to [Community Resource Managers ("CRMs")], Chaplains, and [R&R] Officers." *Id.* at 3.  Plaintiff explains that "[t]his e-mail . . . discussed how 'changes['] are being made to the departmentally approved religious vendors, and in [a]dvance of . . . [the] Religious Personal Property Matrix and [the Department Operations Manual] changes, which will be forthcoming in the near future."[FN2] *Id.*  Then, the next day, on January 4, 2019, a second e-mail "instructs all of the Chaplains . . . [']Do not approve any forms['] that were not in compliance with the new list which [D]efendants knew from the prior day was unauthorized to enforce."

---

[7] Contrary to these allegations, Plaintiff contends that the three-signature process for ordering religious items under CTF DOM Supplement Addendum, 101060 is still "local procedure."  Dkt. 28 at 8.  Thus, according to Plaintiff, Defendant Min is still tasked with reviewing and then approving or denying order forms.  *Id.*

*Id.* at 3, 5.  Plaintiff alleges that Defendants "were aware that [the] CDCR could not yet just deny what Plaintiff was requesting, [i.e.,] religious oils." *Id.* at 5.  However, Plaintiff claims that Defendant Koenig, R&R staff, Chaplains and CRMs "changed the local procedures to get approval of Special Purchase Forms . . . facilitating the underground restrictions on [P]laintiff[']s departmentally authorized religious items." *Id.*

Plaintiff has attached to his complaint copies of his requests to purchase certain religious oils and the limitations to his access to such oils, which also include the grievances Plaintiff submitted requesting to "have [his] special purchase for religious items processed for approval" and to "be free to select any scent of prayer oil." *Id.* at 11-35.  Plaintiff's exhibits indicates that one of his grievances, log no. CTF-19-00178, was "partially granted" but he had to submit [an] "Inmate/Parolee Request" form on April 28, 2019 because he had not "received the Approved Special Religious Purchase form that was granted," and he "[could not] order until this occur[ed]." *Id.* at 35.  The exhibit does not show a response to his request.  *Id.*  Thus, Plaintiff claims that "[t]hese unauthorized changes are burdensome, with no notice given, with malicious intent to deprive Plaintiff . . . [and] [t]hese changes] have had a discriminatory effect on [him] and [his] daily meditation/prayers." *Id.* at 6.  He argues that the aforementioned actions of Defendants violated his rights under RLUIPA, the RFRA, the Free Exercise Clause of the First Amendment and the Fourteenth Amendment. *Id.* at 7.

[FN 2:] Plaintiff claims that as of the date of his complaint, "[n]o such change[s] have officially occurred . . . ." Dkt. 1 at 3.

Dkt. 7 at 2-3 (footnote and brackets in original).

### 3.   Defendants' Version

Plaintiff identifies as a "monotheist" and mostly follows the teachings of the Old Testament and some form of the Koran.  Williams Depo. at 55:12-17.  As part of his religious practice, Plaintiff engages in both prayer and meditation.  *Id.* at 58:2.  When either praying or meditating, Plaintiff applies religious oils, such as a musk, "before coming into the presence of God." *Id.* at 59:2-13.  Plaintiff's religious faith does not dictate that a particular musk scent be used during prayer.  *Id.* at 64:1-3.

Defendants point out that Plaintiff claims he submitted a special purchase order form for certain musks dated on January 2, 2019 and addressed to Garden of Fragrance.  Dkt. 1 at 22.  The CTF R&R Office has no record of ever receiving this January 2, 2019 order form addressed to Garden of Fragrance.  Romero Decl. ¶ 15; McGriff Decl. ¶ 11.  Plaintiff has attached a copy of the January 2, 2019 order form to his complaint, but it does not appear that this order form was

United States District Court
Northern District of California

1   processed by the prison because it was neither signed by the R&R special purchase officer nor

2   marked as "approved/disapproved."  Dkt. 1 at 22.

3       Defendants point out that attached to Plaintiff's complaint is an e-mail dated January 3,

4   2019, which was drafted by Defendant Richey and distributed to CRMs, chaplains, and R&R

5   property officers.  *See* Dkt. 1 at 3, 37.  In the January 3, 2019 e-mail, Defendant Richey explained

6   that the CDCR was working with the approved religious vendors to bring about some changes in

7   the religious oil products being sold and how they are to be packaged.  *Id.*  Defendant Richey

8   further explained that although the changes would start taking place in January 2019, technically,

9   CDCR could not yet deny any oils that did not meet the new requirements.  *Id.*  Neither Sergeant

10  Romero nor Officer McGriff recall receiving or reviewing the January 3, 2019 e-mail.  Romero

11  Decl. ¶ 17; McGriff Decl. ¶ 13.

12      Defendant Richey drafted and distributed another e-mail on January 4, 2019 to all CDCR

13  institution chaplains regarding signature authorization for inmates making religious property

14  purchases.  Richey Decl. ¶ 4, Ex. A.  In this e-mail, Defendant Richey informed chaplains to only

15  approve seven religious oils (kyphi, frankinmyrrh, sage, cedar, lavender, sandlewood, and rose) as

16  well as two types of musks (Egyptian and Arabian).  *Id.*  Defendant Richey explained that the

17  RPPM was in the process of being revised to limit approved musks to only Egyptian and Arabian,

18  and that all approved religious oil vendors were asked to only sell these two types of musks in

19  addition to the seven religious oils.[8]  *Id.*

20      Defendants claim that the anticipated changes to the RPPM were directly related to

21  ensuring the safety and security of CDCR institutions.  Richey Decl. ¶ 5.  The use of certain musk

22  scents, including designer musks, served as a way for inmates to bring contraband items, such as

23  controlled substances, into the prisons.  *Id.*  First, religious vendors were being asked by the

24  purchasers to change labels on oil bottles to reflect that its contents were musk when in fact its

25  actual contents were a non-approved or contraband item.  *Id.*  Second, certain types of musks have

26  strong smells that can mask the smell of some contraband items, such as marijuana.  *Id.*  Inmate

27  _____

28      [8] Plaintiff alleges that the RPPM was never in the process of being revised, and as of
March 2021, it has still not been revised to limit any religious oils and musks.  Dkt. 28 at 8.

1   use of certain musk scents to smuggle in contraband items has been an ongoing issue at multiple

2   CDCR institutions for the last few years.  *Id.*

3       On January 7, 2019, Plaintiff filed an inmate grievance, CTF Appeal Log No. CTF-19-

4   00178.  Dkt. 1 at 13, 15.  In this grievance, Plaintiff alleged that CTF made it "unreasonably

5   burdensome" to purchase and use religious oils.  Dkt. 1 at 15. Plaintiff cites the January 3, 2019

6   and January 4, 2019 e-mails as evidence of "unauthorized changes" to the RPPM.  Dkt. 1 at 13,

7   15, 37-38.  Plaintiff also claimed that CTF's Facility C placed "numerous stop gaps" in which

8   staff did one of the following: (1) took extremely long to process the approval of the special

9   purchase order forms; (2) denied them in violation of rules and regulations, the Administrative

10  Procedure Act, and the Fourteenth Amendment; or (3) did not respond to special purchase order

11  requests.  *Id.*  Plaintiff further argued that it appeared that religions that use prayer oil are being

12  discriminated against by prison officials.  *Id.*

13      On January 7, 2019, Plaintiff also submitted a new special purchase order form for musks;

14  however, this time he addressed it to a different vendor—Madina Industrial Corporation—instead

15  of Garden of Fragrance.  Dkt. 1 at 26.

16      Meanwhile, Defendant Richey eventually realized the error in asking institution chaplains

17  to restrict authorization to only two types of musk scents.[9]  Richey Decl. ¶ 6.  Accordingly, on

18  January 23, 2019, Defendant Richey sent another e-mail to all institution chaplains clarifying

19  allowable religious items for purchase by inmates are those items listed in the current RPPM,

20  including *any* type of musk.  Richey Decl. ¶ 6, Ex. B.  Defendant Richey claims that he reached

21  out to some of the approved religious vendors, informing them that they could sell any musk

22  scents to inmates.[10]  *Id.* ¶ 7.  For example, Defendant Richey claims that he called a representative

23

24      [9] Contrary to Defendants' allegations, Plaintiff claims that Defendant Richey's actions
    were intentional when restricting RPPM items by sending the January 4, 2019 e-mail.  Dkt. 28 at
25  9; Dkt. 1 at 37.  Plaintiff points to Defendant Richey's January 3, 2019 e-mail and argues that
    while Defendant Richey stated in that e-mail that "technically CDCR cannot yet deny oils," this
26  Defendant's January 4, 2019 e-mail shows that he authorized the denial of requests for such oils
    the *very next day*.  *See id.*

27      [10] Plaintiff agrees with this contention, but claims that it took at least *four months* before
28  Defendant Richey told the vendors to lift the unauthorized restrictions to RPPM musk items—not
    the *twenty days* Defendants claim.  Dkt. 28 at 9; Dkt. 1 at 37.

United States District Court
Northern District of California

from the vendor called Garden of Fragrance in April of 2019, informing that vendor to lift the restrictions of selling only Egyptian and Arabian musks. *Id.*

On February 12, 2019, Defendant Min responded to CTF Appeal Log No. CTF-19-00178 at the first level of review. Min Decl. ¶ 7, Ex. C. Defendant Min explained to Plaintiff that the January 4, 2019 e-mail (which restricted chaplain approval to only nine types of religious oils and two types of musks) was amended in a subsequent e-mail dated January 23, 2019. Min Decl. ¶ 7, Ex. D. Defendant Min pointed out to Plaintiff that the January 23, 2019 e-mail clarified that allowable religious items for purchase by inmates are those items listed in the current RPPM, including any type of musk scents. *Id.* Defendant Min also explained to Plaintiff how the process of approval for order forms follows the CTF DOM Supplement Addendum, 101060, dated November 19, 2018. *Id.* Defendant Min subsequently denied Plaintiff's January 7, 2019 special purchase order form addressed to Madina Industrial Corporation.[11] Min Decl. ¶ 8. Defendant Min denied processing this order form because the listed vendor, Madina Industrial Corporation, was not on the approved vendor list for 2019.[12] Min Decl. ¶ 8, Ex. E.[13]

On March 22, 2019, Plaintiff appealed Defendant Min's decision to the second level of

---

[11] Defendant Min states he has no knowledge of the *January 2, 2019* order form for musks addressed to the Garden of Fragrance, as he claims that Plaintiff never mentioned or presented this form to him at the first level review. Min Decl. ¶ 9. Meanwhile, Plaintiff alleges that it was not up to him to show Defendant Min this specific order form, nor to ensure that it was received by the R&R Office staff. Dkt. 28 at 10-11.

[12] Contrary to these allegations, Plaintiff claims that at the interview, Defendant Min told him that he would approve the January 7, 2019 order form to Madina Industrial Corporation. Dkt. 28 at 10. Plaintiff alleges that the excuse that Madina Industrial Corporation was not an approved vendor was not brought up at the interview, and Plaintiff only learned about it when Defendant Min denied the first level of review. Dkt. 28 at 10; Dkt. 1 at 20. Plaintiff also alleges that no list of vendors or notice was posted in January 2019 and that the vendor Madina Industrial Corporation was previously approved for many years prior to that time frame. Dkt. 28 at 7-8.

[13] On March 6, 2019, Defendant Min claims he approved a special purchase order form submitted by Plaintiff. Min Decl. ¶ 10. This approval is recorded in the book that Defendant Min kept in Chapel I during the period from December 10, 2018 and March 14, 2019. Min Decl. ¶ 10, Ex. F. Meanwhile, Plaintiff claims that Defendant Min did not approve and process a special purchase for Plaintiff on March 6, 2019. Dkt. 28 at 10. The record does not include a copy of this special purchase order form, and Defendant Min does not elaborate on whether this form was related to the purchase of religious oils or musks. *See* Min Decl. ¶ 10, Ex. F. Therefore, the Court cannot determine whether this form is relevant to the claims at issue. In any event, neither party relies on this form to support their side, and thus it seems irrelevant and will not be considered.

United States District Court
Northern District of California

United States District Court
Northern District of California

review.  Dkt. 1 at 13-14.   On April 16, 2019, the second level partially granted Plaintiff's request to have his January 2, 2019 special purchase order form addressed to Garden of Fragrance.  Dkt. 1 at 19-21.

On April 28, 2019, Plaintiff submitted a CDCR form 22 requesting that his January 2, 2019 special purchase order form be approved and returned to him.[14]  Dkt. 1 at 35.

On May 8, 2019, Plaintiff appealed his grievance to the third level of review.  Dkt. 1 at 14.  On August 9, 2019, the third level screened-out the grievance, and informed Plaintiff that he had exhausted his administrative remedies.  *Id.* at 11.

On September 11, 2019, Sergeant Romero conducted an interview with Plaintiff regarding CTF Appeal Log No. CTF-19-00178.  Romero Decl. ¶ 14, Ex. C.  The purpose of the interview was to resolve the issue stated in his appeal by offering Plaintiff an expedited-approved replacement order form to order products from the Garden of Fragrance, an approved religious vendor.[15]  *Id.*  Plaintiff declined Sergeant Romero's offer and informed the sergeant that he had filed a lawsuit and was no longer seeking a remedy through the CDCR appeals system.  *Id.*

Although Plaintiff believes that he was denied due process when Defendant Richey made "unauthorized changes" to the RPPM by directing institution chaplains to restrict approval to certain "prayer oil scents and fragrances," Plaintiff admits that there have been no changes to the RPPM since 2013.  Williams Depo. at 18:1-25, 19:1-21, 21:12-20.

As mentioned, Plaintiff also asserted that he was denied "due process" when CTF made changes to the special purchase order forms for religious items by requiring three signatures for approval.  *Id.* at 23-25, 33:16-20.  According to Plaintiff, if the administration makes any changes

---

[14] As explained above, the R&R Office at CTF has no record of ever receiving this January 2, 2019 order form addressed to Garden of Fragrance.  Romero Decl. ¶ 15; McGriff Decl. ¶ 11.  The record only contains an unprocessed copy of the January 2, 2019 order form, which is attached to Plaintiff's complaint.  Dkt. 1 at 22.

[15] Plaintiff claims that his administrative remedies were exhausted on August 9, 2019 when it was screened-out at the third level of review.  Dkt. 28 at 11.  Therefore, according to Plaintiff, the September 11, 2019 interview by Sergeant Romero was "no longer valid."  *Id.*  Even so, Plaintiff claims that he asked for a copy of the January 2, 2019 order form to Garden of Fragrance, which he was granted, but Sergeant Romero could not provide it.  *Id.*  Plaintiff alleges that this is how the interview concluded.  *Id.*  Plaintiff does not explain when or how he received the copy of the January 2, 2019 order form that is attached to his complaint.  *See* Dkt. 1 at 22.

1    to the DOM, inmates typically understand that it is their responsibility to keep up with such

2    changes by "go[ing] to the law library or read[ing] the bulletin boards" where these changes are

3    available to inmates to review.  *Id.* at 27:24-25, 28:1-17 (brackets added).

4         Describing the process of procuring the special purchase order form, Plaintiff alleged that

5    the forms are available through the chapel clerk.  *Id.* at 69:9-11.  However, the order forms

6    provided to Plaintiff may not necessarily be the "proper" forms; in other words, it may be an old

7    order form.  *Id.* at 69:11-25, 70:1-17.  Regarding the list of approved vendors for the 2019

8    calendar year, Plaintiff testified that he had seen that list posted on the bulletin board of his

9    housing unit and in the law library.  *Id.* at 67:15-25, 68:1.

10        The last time Plaintiff attempted to procure a special purchase order form was in the

11   beginning of 2020.  *Id.* at 47:6-9.  Plaintiff testified that he heard a "rumor" that there was a new

12   way to process the order forms in that the forms no longer go through the chaplain; instead, the

13   forms go from the R&R Office and then to the captain.  *Id.* at 46:2-6.  However, when Plaintiff

14   went to the chapel to pick up a special purchase order form, he realized that the order form did not

15   change.  *Id.* at 47:6-9.  Rather, it was the same order form with the three signature blocks.  *Id.*

16   Plaintiff testified that a chapel clerk explained to him to write "N/A" on the chaplain signature

17   block and then send it straight to the R&R Office.  *Id.* at 47:12-15.

18        Plaintiff further testified that he subsequently went to the law library to look into the DOM

19   to see if the rule changed.  *Id.* at 48:12-13.  When he saw there were no rule changes to the special

20   purchase order form process, he chose not to proceed with the method explained by the chapel

21   clerk.  *Id.* at 48:8-15.  Plaintiff felt he could not "circumvent a signature," *id.* at 47:19-20, and

22   instead was going to "follow what the rule says," *id.* at 48:15.

23        Plaintiff testified that some CTF inmates, most of whom follow the Islamic faith, have

24   been letting Plaintiff use some of their prayer oils.  *Id.* at 71:21-24; 72:7-19; 77:1-3.  According to

25   Plaintiff, some of these inmates are procuring their religious oils through, what the Plaintiff refers

26   to as, "the new process."  *Id.* at 72:20-25; 74:10-23.  Even though some inmates at CTF were able

27   to get their special purchase order forms for religious oils processed by writing "N/A" or "not

28   applicable" in the chaplain signature block of the order form, Plaintiff decided against this course

United States District Court
Northern District of California

1  of action.  *Id.* at 74:20-25; 75:1-8.

2      Plaintiff also testified that since January 2019, he continues his prayers and/or meditations,

3  but on a "limited" basis.  *Id.* at 64:17-25; 65:1-4.  For instance, Plaintiff might pray and/or

4  meditate two to five times a day, *Id.* at 65:1-12, and sometimes with the use of religious oils

5  provided to him from other inmates, *Id.* at 71:21-24; 72:7-15.

6      Plaintiff clarified that he is alleging a violation of the Equal Protection Clause under the

7  Fourteenth Amendment against Defendants Koenig, Min, and Richey.  *Id.* at 75:13-17.  Plaintiff

8  then testified that other inmates experiencing denials of their special purchase order forms for

9  religious oils are not necessarily members of the same religious group.  *Id.* at 77:23-25; 78:1-7.

10  He testified that, "[i]t's not the actual religion that's the issue.  The issue is they don't want to

11  process [the order forms].  They don't care what religion you are."  *Id.* at 78:7-9.

12  ## III.    LEGAL STANDARD

13      Summary judgment is proper where the pleadings, discovery and affidavits demonstrate

14  that there is "no genuine issue as to any material fact and that the moving party is entitled to

15  judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Material facts are those which may affect the

16  outcome of the case.  *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).  A dispute as to a

17  material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for

18  the nonmoving party.  *Id.*

19      The party moving for summary judgment bears the initial burden of identifying those

20  portions of the pleadings, discovery, and affidavits which demonstrate the absence of a genuine

21  issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Where the moving

22  party will have the burden of proof on an issue at trial, it must affirmatively demonstrate that no

23  reasonable trier of fact could find other than for the moving party.  On an issue for which the

24  opposing party by contrast will have the burden of proof at trial, as is the case here, the moving

25  party need only point out "that there is an absence of evidence to support the nonmoving party's

26  case."  *Id*. at 325.

27      Once the moving party meets its initial burden, the nonmoving party must go beyond the

28  pleadings and, by its own affidavits or discovery, "set forth specific facts showing that there is a

United States District Court
Northern District of California

13

genuine issue for trial." Fed. R. Civ. P. 56(e). The court is only concerned with disputes over material facts and "[f]actual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248. It is not the task of the court to scour the record in search of a genuine issue of triable fact. *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996). The nonmoving party has the burden of identifying, with reasonable particularity, the evidence that precludes summary judgment. *Id*. If the nonmoving party fails to make this showing, "the moving party is entitled to a judgment as a matter of law." *Celotex*, 477 U.S. at 323.

For purposes of summary judgment, the court must view the evidence in the light most favorable to the nonmoving party; if the evidence produced by the moving party conflicts with evidence produced by the nonmoving party, the court must assume the truth of the evidence submitted by the nonmoving party. *See Leslie v. Grupo ICA*, 198 F.3d 1152, 1158 (9th Cir. 1999). The court's function on a summary judgment motion is not to make credibility determinations or weigh conflicting evidence with respect to a disputed material fact. *See T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

A district court may only consider admissible evidence in ruling on a motion for summary judgment. *See* Fed. R. Civ. P. 56(e); *Orr v. Bank of America*, 285 F.3d 764, 773 (9th Cir. 2002). Submitted by Defendants in support of the motion for summary judgment are Plaintiff's deposition (Trenbeath Decl., Ex. A) as well as declarations by Defendants Richey and Min, Deputy Attorney General Jean M. Trenbeath (Defendants' attorney), Officer McGriff, and Sergeant Romero, along with various supporting exhibits (Dkts. 24-2 through 24-11). Meanwhile, Plaintiff has filed his verified complaint and a verified opposition to Defendants' motion for summary judgment. Dkts. 1, 28. The Court will construe these filings as affidavits under Federal Rule of Civil Procedure 56, insofar as they are based on personal knowledge and set forth specific facts admissible in evidence. *See Schroeder v. McDonald*, 55 F.3d 454, 460 & nn.10-11 (9th Cir. 1995).

## IV.    DISCUSSION

As mentioned above, on April 28, 2020, the Court determined that Plaintiff stated cognizable claims under the First Amendment's Free Exercise Clause, the Fourteenth

United States District Court
Northern District of California

1    Amendment, and RLUIPA against Defendants Richey, Koenig, and Min.  Dkt. 7 at 4.

2    Specifically, Plaintiff alleges that Defendants limited his ability to purchase religious oils or

3    musks for his "daily meditation/prayers" by either sending an e-mail restricting the purchase of

4    certain musks or by denying/failing to process his special purchase order forms for his musks, in

5    violation of his rights under the First and Fourteenth Amendments and RLUIPA.  Dkt. 1 at 3, 5-9.

6    Plaintiff claims that his special purchase order form was denied due to a change in policy

7    restricting the purchase of certain types of prayer oils and musks, in contravention of the RPPM

8    that has been in place since 2013.  *See id.*

9          In their motion for summary judgment, Defendants claim that they did not violate

10   Plaintiff's rights under the constitution or RLUIPA, stating as follows:

11             . . .  Although Defendant Richey did initially instruct institution
12       chaplains to limit inmates to two types of musks in anticipation of
         upcoming changes to the RPPM, the RPPM was never amended.  And
13       Defendant Richey retracted this directive to the institution chaplains
         within 20 days of sending the initial directive.  Therefore, any harm
14       to Plaintiff was *de minimis*, and Defendant Richey's conduct did not
         violate Plaintiff's constitutional or statutory rights.

15       Plaintiff also claims that all Defendants continued to deny Plaintiff
         his prayer oils, particularly musks, by implementing a "burdensome"
16       special purchase order process at CTF.  Although the special purchase
         order form for religious items required three signatures for a period
17       of three months, again, any harm to plaintiff is *de minimis*.  Moreover,
         any denial of Plaintiff's special purchase orders for musks was due to
18       his seeking to purchase the musks from an unapproved religious
         vendor for the 2019 calendar year.
19
         Plaintiff's due-process claims also fail.  No changes to the RPPM
20       actually occurred, and the special purchase officer at CTF strictly
         adhered to the RPPM when reviewing inmate's special purchase order
21       forms for religious items, not any directive from Defendants.

22       Plaintiff's Free Exercise claim also fails because the purported harm
         he suffered is *de minimis*, if any, and the initial restrictions Defendant
23       Richey placed on the types of musks that could be ordered were based
         on legitimate safety and security concerns. Additionally, Plaintiff,
24       like other CTF inmates who use prayer oils and musks in their
         religious practice, is free to order any musk in accordance with the
25       RPPM, so long as the order is placed with an approved religious
         vendor.  Therefore, any demand for injunctive relief pursuant to
26       RLUIPA is moot.

27       Furthermore, Plaintiff's Equal Protection claim fails because there is
         no evidence of discrimination by any Defendant, and Plaintiff
28       testified at his deposition that order forms are denied regardless of the

1    inmate's religion.   Lastly, Defendants are entitled to qualified
2    immunity.

Dkt. 24 at 6-7.

### A.   RLUIPA

RLUIPA provides that no state may impose a "substantial burden" on an inmate's exercise of religion unless the action or policy in question provides the least restrictive means of serving a compelling governmental interest.  42 U.S.C. § 2000cc-1(a).  RLUIPA does not define "substantial burden."  *See* 42 U.S.C. § 2000cc-5.  The Ninth Circuit, however, has held that a "substantial burden" on "religious exercise" is one that imposes "a *significantly great* restriction or onus upon such exercise."  *Hartmann v. Cal. Dep't of Corr. & Rehab.*, 707 F.3d 1114, 1125 (9th Cir. 2013) (emphasis added) (quoting *San Jose Christian Coll. v. City of Morgan Hill*, 360 F.3d 1024, 1034 (9th Cir. 2004)).  "Religious exercise," for RLUIPA purposes, includes "any exercise of religion, whether or not compelled by, or central to, a system of religious belief."  42 U.S.C. § 2000cc-5(7)(A).  The exercise of religion may involve not only the belief and profession, but the performance of physical acts such as group assembly for worship.  *See Greene v. Solano County Jail*, 513 F.3d 982, 987 (9th Cir. 2008).

The first step in a RLUIPA inquiry is to define the religious exercise at issue.  *Greene v. Solano County Jail*, 513 F.3d 983, 987 (9th Cir. 2008).  The plaintiff bears the burden of coming forward with evidence demonstrating the state's action or policy constituted a substantial burden on his exercise of religion.  *Warsoldier v. Woodford*, 418 F.3d 989, 994-95 (9th Cir. 2005).  The focus of this initial inquiry necessarily is on the manner in which the plaintiff's religious exercise is impacted, rather than on the reasonableness of the facility's policy or regulation.  *Id.* at 995.  A *de minimis* injury does not suffice to make a claim under RLUIPA because it does not constitute a "significantly great restriction or onus" upon the plaintiff's exercise of his religious rights.  *See McKenzie v. Ellis*, No. 10-1490, 2012 U.S. Dist. LEXIS 130973, *10 (S.D. Cal. 2012).  Once the plaintiff has met his initial burden of showing a substantial burden on his exercise of religion, the burden shifts to the government to show that the burden imposed is in furtherance of a "compelling" government interest (rather than simply a legitimate penological interest), and that it achieves the compelling interest by the least restrictive means.  *See* 42 U.S.C. § 2000cc-1(a);

1  *Shakur v. Schriro*, 514 F.3d 878, 889 (9th Cir. 2008).

2        On the evidence in the record, no rational trier of fact could find in Plaintiff's favor on a

3  RLUIPA claim.  While Plaintiff believes that the two e-mails dated January 3 and 4, 2019 (sent to

4  institution chaplains and R&R property officers, *see* Dkt. 1 at 37-38) set in motion an ongoing

5  prohibition of his purchasing any type of musk scent, he fails to provide any evidence that his

6  religious practice was substantially burdened by Defendants' actions.  *See Warsoldier*, 418 F.3d at

7  994-95.  As further explained below, Defendants are entitled to judgment as a matter of law on the

8  RLUIPA claim.

9        First, the record shows that within 20 days of sending the January 4, 2019 e-mail to

10  institution chaplains, Defendant Richey sent another e-mail, dated January 23, 2019, to institution

11  chaplains clarifying that the allowable religious items for purchase by inmates are those items

12  listed in the current RPPM, including *any type of musk*.  *See* Richey Decl. ¶ 6, Ex. B.

13        Second, neither Sergeant Romero nor Officer McGriff from CTF's R&R Office recall

14  receiving or reviewing the January 3, 2019 e-mail cited by Plaintiff in his complaint, and

15  therefore, they did not rely on that e-mail when processing special purchase order forms.  *See*

16  Romero Decl. ¶ 17; McGriff Decl. ¶ 13; Dkt. 1 at 37.  Rather, at all relevant times, Officer

17  McGriff strictly adhered to the RPPM when reviewing inmates' special purchase order forms for

18  religious items.  *See* McGriff Decl. ¶ 14, Ex. D.

19        Third, in April of 2019, Defendant Richey notified Garden of Fragrance to lift the initial

20  restrictions on selling only Egyptian and Arabian musks to inmates.  *See* Richey Decl. ¶ 7.

21  Defendant Richey's corrective actions in this regard would not have negatively impacted

22  Plaintiff's attempt to order any type of musk scent from this vendor.  *See* Dkt. 1 at 19-22.

23        Thus, the record shows that CTF still permits inmates to purchase and use prayer oils,

24  including *any type of musk*, in accordance with the current RPPM.  *See* Romero Decl. ¶ 13;

25  McGriff Decl. ¶¶ 10, 14, Ex. D; Min Decl. ¶ 7.  This is true despite the brief directive caused by

26  Defendant Richey's January 4, 2019 e-mail restricting the types of musks inmates could order,

27  which was furthered by a legitimate governmental interest related to safety and security of the

28

United States District Court
Northern District of California

United States District Court
Northern District of California

1  institution (as explained in more detail in the following section below[16]).  *See* Richey Decl. ¶ 5.

2  And the inconvenience Plaintiff may have experienced (when trying to order musk scents for his

3  daily mediations and/or prayers) does not violate RLUIPA.  *See Lewis v. Ollison*, 571 F. Supp. 2d

4  1162, 1171-72 (C.D. Cal. 2008) (dismissing RLUIPA claims upon finding that denial of prisoner's

5  request to obtain and possess more oil than stated amounts permitted for religious oil did not

6  impose substantial burden on religious exercise because facility permitted inmates to possess

7  sufficient amount of prayer oil, even though plaintiff averred that limited amount permitted did not

8  suffice to cover demands of oil usage required in Islam).

9         Furthermore, even if the January 4, 2019 e-mail led to a temporary restriction on

10  purchasing religious musks, Plaintiff's exercise of his religious rights were not significantly

11  restricted, as his religious faith does not dictate that a *particular* musk be used during prayer.

12  Williams Depo. at 64:1-3.  Thus, Plaintiff has shown no harm, or at most, *de minimis* harm, to his

13  religious beliefs due to Defendant Richey's actions of sending the January 4, 2019 e-mail

14  temporarily restricting the purchase of religious musks.

15         Finally, Plaintiff also demands injunctive relief pursuant to RLUIPA "from contested

16  policy moves of defendants."  Dkt. 1 at 3.  However, his request for injunctive relief is moot

17  because the record shows that the RPPM was never revised, and the special purchase order forms

18  now only need two signatures and still continue to be reviewed in accordance with the current

19  RPPM.  Richey Decl. ¶ 8, Ex. C; Romero Decl. ¶ 13; McGriff Decl. ¶¶ 10, 14, Ex. D.

20         In sum, on the evidence in the record, no rational trier of fact could find in Plaintiff's favor

21  on a RLUIPA claim because Plaintiff fails to provide any evidence that the denial of his special

22  purchase order forms substantially burdened his exercise of religion.  *See Warsoldier*, 418 F.3d at

23  994-95.  Defendants are thus entitled to judgment as a matter of law on the RLUIPA claim.

24         **B.     First Amendment Free Exercise**

25         The First Amendment provides that "Congress shall make no law respecting an

26  establishment of religion, or prohibiting the free exercise thereof."  U.S. Const. amend. I.  "The

27

28  _____

[16] *See infra* DISCUSSION Part IV.B.

18

first of the two Clauses, commonly called the Establishment Clause, commands a separation of church and state.  The second, the Free Exercise Clause, requires government respect for, and noninterference with, the religious beliefs and practices of our Nation's people."  *Cutter v. Wilkinson*, 544 U.S. 709, 719 (2005).  The free exercise right is necessarily limited by the fact of incarceration, and may be curtailed in order to achieve legitimate correctional goals or to maintain prison security.  *See O'Lone v. Shabazz*, 482 U.S. 342, 348-49 (1987).  In order to prevail on a free exercise claim, a prisoner must show a defendant burdened the practice of his religion without any justification reasonably related to legitimate penological interests.  *See Shakur v. Schriro*, 514 F.3d 878, 883-84 (9th Cir. 2008).

The Supreme Court has identified four factors for courts to consider when determining whether a regulation or practice is reasonably related to legitimate penological interests: (1) whether there is a "'valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it," (2) "whether there are alternative means of exercising the right that remain open to prison inmates," (3) "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally," and (4) the "absence of ready alternatives," or, in other words, whether the rule at issue is an "'exaggerated response' to prison concerns."  *Turner v. Safley*, 482 U.S. 78, 89-90 (1987) (citation omitted).  The task in considering the *Turner* factors is not to balance the four factors, but, rather, to determine whether the state shows a "reasonable" relation between the policy and legitimate penological objectives, rather than simply a "logical" one.  *Beard v. Banks*, 548 U.S. 521, 533 (2006).  While all justifiable inferences must be drawn in the nonmoving party's favor with respect to matters of disputed fact, the court's inferences must accord deference to the views of prison authorities in disputed matters of professional judgment.  *See id.* at 529-30. Unless a prisoner can point to evidence showing the policy is not reasonably related to legitimate penological objectives, sufficient to allow him to prevail on the merits, he cannot prevail at the summary judgment stage.  *Id.* at 530.

Turning to the instant action, with respect to the first *Turner* factor, the undisputed evidence shows a rational and valid connection between a legitimate government interest in

maintaining prison order and security and Defendant Richey's initial decision on January 4, 2019 to temporarily restrict the types of musk inmates could order.  Courts recognize that preserving the safety and security of a prison, staff, and inmates is a legitimate penological interest.  *Mauro v. Arpaio*, 188 F.3d 1054, 1059 (9th Cir. 1999); *Procunier v. Martinez*, 416 U.S. 396, 413 (1974) (holding that legitimate penological interests include "security, order, and rehabilitation"), *overruled on other grounds, Thornburgh v. Abbott*, 490 U.S. 401, 413-14 (1989).  The record shows that the anticipated changes to the RPPM were directly related to ensuring the safety and security of CDCR institutions.  Richey Decl. ¶ 5.  According to Defendant Richey, the "use of certain musk scents, including designer musks, served as a way for inmates to bring contraband items, such as controlled substances, into the prisons."  *Id.*  For example, Defendant Richey points out that "religious vendors were being asked by the purchasers to change labels on oil bottles to reflect that its contents were musk when in fact its actual contents were a non-approved or contraband item."  *Id.*  He adds that "certain types of musks have strong smells that can mask the smell of some contraband items, such as marijuana."  *Id.*  He also states that "[i]nmate use of certain musk scents to smuggle in contraband items has been an ongoing issue at multiple CDCR institutions for the last few years."  *Id.*  These aforementioned reasons, as set forth in Defendant Richey's declaration, establishes a reasonable relationship between the temporary restrictions on an inmate's possession of certain musk scents and the penological interests of maintaining institutional safety, security, and rehabilitation.  Accordingly, this factor weighs in favor of Defendants.

As noted earlier, the second *Turner* factor is "whether there are alternative means of exercising the right that remain open to prison inmates."  *Turner*, 482 U.S. at 89-90.  The restrictions on Plaintiff's use of musk scents did not deprive Plaintiff of all means of exercising his religious beliefs.  Even if Defendant Richey's restrictions on Plaintiff's use of musk scents had actually remained in place, alternatives would have been immediately available to Plaintiff.  Plaintiff still had access to Egyptian and Arabian musks, as well as seven other oils.  Richey Decl. ¶ 4, Ex. A.  Indeed, Plaintiff even testified at his deposition that his religious faith does not dictate that a particular musk scent be used during prayer.  Williams Depo. at 64:1-3.  Therefore, this

1   factor weighs in favor of Defendants, as Plaintiff had alternative means of exercising his right to

2   practice his religion.

3       The third *Turner* factor requires the Court to consider the "impact accommodation of the

4   asserted constitutional right will have on guards and other inmates, and on the allocation of prison

5   resources generally." *Turner*, 482 U.S. at 90.  Here, the third factor under *Turner* has not been

6   borne out as inmates are permitted to continue to purchase and use any musk scent in accordance

7   with the current RPPM.  Richey Decl. ¶ 8, Ex. C.  Accordingly, neither Defendant Richey's

8   conduct nor the current CDCR special purchase order procedure have had significant negative

9   effects on other inmates or guards.  Thus, this factor weighs in favor of Defendants.

10      The fourth *Turner* factor requires the Court to consider whether there is an "absence of

11  ready alternatives" to the prison policy.  *Turner*, 482 U.S. at 90.  The burden is on the prisoner

12  challenging the regulation to show that there are obvious, easy alternatives to the regulation.

13  *See O'Lone*, 482 U.S. at 350; *see also Mauro v. Arpaio*, 188 F.3d 1054, 1063 (9th Cir. 1999).

14  Ultimately, this factor weighs in favor of Defendants because Defendant Richey's short-lived

15  restrictions on inmates' purchase of musks were not an exaggerated response to prison concerns

16  because inmate use of certain musk scents to smuggle in contraband items had been an ongoing

17  issue at multiple CDCR institutions for the last few years.  Richey Decl. ¶ 5.  Moreover, as

18  mentioned above, such restrictions would still allow inmates to purchase and use Egyptian and

19  Arabian musks, in addition to seven other types of prayer oils.  Richey Decl. ¶ 4, Ex. A.

20      Having considered the various *Turner* factors, the Court concludes that Defendant

21  Richey's conduct was reasonably related to the legitimate penological interests in staff and inmate

22  safety.  Plaintiff does not show or raise a triable issue of fact that his right to free exercise of

23  religion was improperly impinged upon by Defendants.  Defendants are therefore entitled to

24  judgment in their favor on Plaintiff's First Amendment claim.

25      **C.      Fourteenth Amendment Equal Protection**

26      "The Equal Protection Clause of the Fourteenth Amendment commands that no State shall

27  'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a

28  direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne*

United States District Court
Northern District of California

21

*Living Center*, 473 U.S. 432, 439 (1985).  In the prison or jail context, the Equal Protection Clause requires that an inmate who is an adherent of a minority religion be afforded a "reasonable opportunity of pursuing his faith comparable to the opportunity afforded fellow prisoners who adhere to conventional religious precepts," *Cruz v. Beto*, 405 U.S. 319, 322 (1972) (Buddhist inmates must be given opportunity to pursue faith comparable to that given Christian inmates), as long as the inmate's religious needs are balanced against the reasonable penological goals of the prison, *O'Lone*, 482 U.S. at 349.  An inmate cannot prevail on his equal protection claim "if the difference between the defendants' treatment of him and their treatment of [other] inmates is 'reasonably related to legitimate penological interests.'"  *Shakur*, 514 F.3d at 891 (citations omitted).

To survive summary judgment on his equal protection claim, Plaintiff must show a triable issue of fact that Defendants intentionally treated him differently from similarly situated inmates.  *See McCollum v. Cal. Dep't of Corr. and Rehab.*, 647 F.3d 870, 880-81 (9th Cir. 2011) (granting summary judgment for prison officials on Wiccan prison chaplain's equal protection claim where plaintiff-chaplain, among other things, had failed to articulate which clergy were similarly situated to him).  Plaintiff fails to do so.

In his deposition, Plaintiff testified that, "[i]t's not the actual religion that's the issue.  The issue is they don't want to process [the order forms].  They don't care what religion you are."  Williams Depo. at 78:7-9.  Based on Plaintiff's own aforementioned statements, Defendants did not violate Plaintiff's rights under the Equal Protection Clause of the Fourteenth Amendment.  No evidence exists showing that any other similarly situated inmates were unable to purchase religious oils or musks that were in accordance with the RPPM and CTF's policies.  The mere fact that Plaintiff reportedly had a religion and that he was restricted from purchasing certain musk scents from a restricted vendor does not lead to any reasonable inference that the latter happened because of the former.  Nor does the denial of Plaintiff's special purchase order forms support an inference of intent to discriminate against Plaintiff because of his religion.  The record also shows that even after his January 7, 2019 order form was denied (as it involved an unapproved vendor), Sergeant Romero offered Plaintiff an expedited-approved replacement order form to order the

22

products he desired from an approved religious vendor.  Romero Decl. ¶ 14, Ex. C.  As for the failure to process Plaintiff's January 2, 2019 order form, the record shows that Defendants claim they never received this form.  *See* Romero Decl. ¶ 15; McGriff Decl. ¶ 11.  Moreover, the record shows Defendants eventually offered Plaintiff an expedited-approved replacement order form to order his musks, but Plaintiff declined such an offer and instead decided to pursue this lawsuit. *See* Romero Decl. ¶, Ex. C.  Therefore, on the evidence in the record, no reasonable jury could find that Defendants denied or failed to process Plaintiff's special purchase order forms due to impermissible discriminatory intent against inmates who were of his religion.

Finally, even if the denial of Plaintiff's January 7, 2019 order form resulted in unequal treatment of those who are of his religion and other inmates, to the extent that the decision to deny that order form resulted from Defendant Richey's January 4, 2019 initial decision to temporarily restrict the purchase of certain musks—such a denial passes muster under the *Turner* test as explained above.  *See supra* DISCUSSION Part IV.B.  The same *Turner* analysis that requires rejection of Plaintiff's free exercise claim also requires rejection of his equal protection claim.  *See id.*

Accordingly, Plaintiff has not raised a triable issue of fact that his right to equal protection was improperly impinged upon by Defendants.  Defendants are therefore entitled to judgment in their favor on Plaintiff's claim under the Fourteenth Amendment's Equal Protection Clause.

### D. Fourteenth Amendment Due Process

The Due Process Clause of the Fourteenth Amendment protects individuals against governmental deprivations of "life, liberty or property," as those words have been interpreted and given meaning over the life of our republic, without due process of law.  *Board of Regents v. Roth*, 408 U.S. 564, 570-71 (1972); *Mullins v. Oregon*, 57 F.3d 789, 795 (9th Cir. 1995).

The touchstone of due process is protection of the individual against arbitrary action of government, whether the fault lies in a denial of fundamental procedural fairness (i.e., denial of procedural due process guarantees) or in the exercise of power without any reasonable justification in the service of a legitimate governmental objective (i.e., denial of substantive due process guarantees).  *See County of Sacramento v. Lewis*, 523 U.S. 833, 845-46 (1998).

United States District Court
Northern District of California

1    Title 15 of the California Code of Regulations outlines the procedures for determining the

2  personal property that may be purchased from various contracted vendors by California state

3  prison inmates at their own expense.  *See* Cal. Code Regs. tit. 15, § 3190.  Section 3190,

4  subsection (b), of Title 15 states that, "[a]ll changes to the [RPPM] shall be adopted in accordance

5  with the rulemaking requirements of the Administrative Procedure Act (Government Code

6  Sections 11340 through 11350.3) and, if applicable, Penal Code 5058.3."  *See id.* (brackets added).

7  Thus, any anticipated changes to the RPPM must first go through the notice, comment, and

8  hearing procedures of the California Administrative Procedure Act, which would afford the

9  opportunity to oppose any anticipated changes.

10    Defendant Richey did not follow the correct process for making changes to the RPPM

11  when he e-mailed institution chaplains about limiting the types of musks inmates can order from

12  approved vendors in anticipation of changes to the RPPM.  Dkt. 1 at 13, 15, 38; Richey Decl. ¶ 4,

13  Ex. A.  However, once Defendant Richey realized the error, he sent a follow-up e-mail to

14  institution chaplains on January 23, 2019, clarifying allowable religious items for purchase by

15  inmates are those items listed in the current RPPM, including *any type of musk*.  Richey Decl. ¶ 6,

16  Ex. B.  Defendant Richey also reached out to one of the approved vendors, Garden of Fragrance,

17  in April of 2019, informing this vendor to lift the restrictions on selling only Egyptian and Arabian

18  musks to inmates.  Richey Decl. ¶ 7.  No changes have been made to the RPPM since it was last

19  finalized on December 9, 2013.  Richey Decl. ¶ 8, Ex. C.

20    As mentioned, Sergeant Romero and Officer McGriff cannot recall receiving or reviewing

21  an e-mail dated January 3, 2019 (cited by Plaintiff in his complaint, *see* Dkt. 1 at 37), in which

22  Defendant Richey explained that the CDCR was working with the approved religious vendors to

23  bring about some changes in the religious oil products being sold and how they are to be

24  packaged.  Romero Decl. ¶ 17; McGriff Decl. ¶ 13; Dkt. 1 at 37. Ex. C.  Officer McGriff, who was

25  the special purchase officer for the CTF R&R Office from October 2014 to February 2020, would

26  ensure that the religious items sought for purchase were on the RPPM.  McGriff Decl. ¶¶ 1, 8.

27  This demonstrates that any proposed restrictions on the types of musks an inmate could order did

28  not affect Officer McGriff's actions as a special purchase officer when he reviewed inmates'

24

United States District Court
Northern District of California

1   special purchase order forms requesting the purchase of any musk scent.  Thus, since the

2   anticipated changes to the RPPM never occurred, Plaintiff's due process rights were not violated.

3         Furthermore, there is no constitutionally recognized procedure for noticing inmates of

4   changes to the departmental procedure of a particular prison or correctional facility.  While any

5   proposed changes to the RPPM must be adopted in accordance with the rulemaking requirements

6   of the Administrative Procedure Act, Defendant Koenig was not required to go through that

7   process when he approved changes to CTF DOM Supplement Addendum, 101060 on November

8   19, 2018.  At most, Plaintiff is only owed access to updated versions of the DOM at CTF,

9   including any revised special purchase order forms.  Plaintiff testified at his deposition that he has

10  accessed the DOM by going to the law library, and that "it's on [him]" to go to the law library to

11  research the DOM or any changes made to it.  Williams Depo. at 27:24-25, 28:1-17, 48:12-13.

12        Under section 3190(k)(4) of Title 15 of the California Code of Regulations, "Special

13  purchases of religious items will be from departmentally-approved vendors of religious items

14  only," the latter of which "will be at the determination of the Statewide Religious Review

15  Committee."  Additionally, "[t]he institution head or designated staff shall ensure approved

16  vendor catalogs and order forms are available to inmates who qualify."  California Code of

17  Regulations, tit. 15, §3190(k).  The special purchase order forms, as well as the list of CDCR-

18  approved religious vendors for the current calendar year, are available in each chapel at CTF.  Min

19  Decl. ¶ 5.  Plaintiff admits that the order forms were available through the chapel clerk, *see*

20  Williams Depo. at 69:9-11, and that Plaintiff had seen the approved-vendor list for 2019 on the

21  bulletin board of his housing unit and in the law library, *see id.* at 67:15-25, 68:1.

22        Moreover, there is no connection between the order form process implemented by

23  Defendant Koenig's and Defendant Richey's actions in early January 2019.  Defendant Richey

24  had no knowledge of the CTF DOM Supplement Addendum, 101060, as he took no part in

25  drafting or reviewing it.  Richey Decl. ¶ 9.  In addition, Sergeant Romero and Officer McGriff,

26  (both of whom have direct knowledge and experience following the procedure outlined in the CTF

27  DOM Supplement Addendum, 101060) state that they have no recollection of seeing the January

28  3, 2019 e-mail drafted by Defendant Richey about anticipated changes to the RPPM.  Romero

Decl. ¶ 17; McGriff Decl. ¶ 13; Dkt. 1 at 37, Ex. C.  More importantly, Officer McGriff stated that he strictly adhered to the RPPM when reviewing and processing special purchase order forms while working as the special purchase officer in the CTF R&R Office.  McGriff Decl. ¶ 14, Ex. D.

Thus, based on the foregoing, Plaintiff did not suffer any violation of his due process rights under the Fourteenth Amendment.  Accordingly, Defendants are entitled to judgment as a matter of law regarding Plaintiff's Fourteenth Amendment Due Process claim.

## V.  CONCLUSION

For the reasons stated above, the Court GRANTS Defendants' motion for summary judgment.[17]  Dkt. 24.

The Clerk shall terminate all pending motions and close the file.

This Order terminates Docket No. 24.

IT IS SO ORDERED.

Dated: September 15, 2021

_____
JUDGE YVONNE GONZALEZ ROGERS
United States District Judge

---

[17] The Court's finding that Defendants are entitled to summary judgment as a matter of law as to Plaintiff's claims obviates the need to address their alternative arguments regarding an entitlement to qualified immunity.